UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RACHVES ESTATES, LLC,     Civil Action No.:

                    Plaintiff,

     -against-     **COMPLAINT**

DURABUILT HOMES, LLC,

                    Defendant.
-------------------------------------------------------------------X

The Plaintiff, RACHVES ESTATES LLC, by its attorneys Malvina Lin, P.C. complaining of the Defendant respectfully shows and alleges upon information and belief as follows:

## THE PARTIES

1. At all relevant times Plaintiff Rachves Estates, LLC ("Rachves") is a New York Domestic Limited Liability Company duly formed and authorized to conduct business in the State of New York on April 14, 2015. Plaintiff's principal business address is 199 Lee Avenue, #161, Brooklyn, New York 11211.

2. At all relevant times Defendant Durabuilt Homes LLC ("Durabuilt") is a foreign business corporation organized and existing under the laws of Pennsylvania with a business address of 1910 North Old Trail, Selinsgrove, Pennsylvania 17870.

3. At all relevant times and upon information and belief all the members of Durabuilt are individuals who are domiciled in the State of Pennsylvania and none of which are domiciled in the State of New York.

1

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over this action because the action is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

5. Pursuant to 28 U.S.C. § 1391, venue lies in the Southern District of New York based upon the fact that it is the judicial district within which a substantial part of the events giving rise to the Plaintiff's claims occurred.

## STATEMENT OF FACTS

6. Plaintiff is the owner and developer of a housing project at the property identified as State Highway 42, Woodbourne, New York 12788, Sullivan County, Section 21, Block 1 Lot 2.1 & 6279 State Route 52, Woodbourne, NY 12788, Sullivan County, Section 14, Block 1, Lot 31 (the "Project").

7. At all relevant times Durabuilt regularly conducted business and marketed and sold its goods and services to purchasers in the State of New York including the Plaintiff Rachves.

8. At all relevant times Durabuilt regularly conducted business and marketed and sold its goods and services to purchasers in Sullivan County.

9. At all relevant times Durabuilt is a manufacturer of off-site custom modular homes providing the full range of services from the initial design and consultation for the manufacturing and delivery of modular homes to the installation of a turn key home.

10. Durabuilt promises "our focus has been and will continue to be our integrity and fulfillment of our commitments."

11. Durabuilt promises they "utilize a wide range of materials … and are always willing to customize a project."

12. In connection with the Project the Plaintiff engaged with Durabuilt to provide certain modular homes to be completed, delivered and installed at the Project site all located within the State of New York in Sullivan County.

13. Upon information and belief Durabuilt regularly sold its modular home products to other similar developers in Sullivan County in the State of New York.

14. Rachves placed orders with Durabuilt for a total of sixty-six (66) modular home structures.

15. Durabuilt promised to deliver the modular home structures completed in a professional manner by skilled craftsmen, delivering a great product, with on time delivery, hassle free, turn key and completed in accordance with strict compliance with all specifications and standard state building codes for New York State which is where the homes were to be finally located.

16. Durabuilt promised that all modular homes shall be complete and contain each and every item required for each custom modular home and complete all services necessary to complete the home.

17. In connection with the orders by Rachves for the modular homes Durabuilt required that Rachves advance a deposit.

18. Specifically, the Durabuilt deposit agreement states in relevant part as follows: "Due to the size and nature of the business that Durabuilt conducts, it is our standard practice to

require our customers to pay deposits when ordering their houses. This is to ensure that both parties are fully vested in the nature of the agreement. Durabuilt requires an engineering deposit and a production deposit."

19. Durabuilt collected a deposit before manufacturing and delivering the first phase of modular homes for the Project.

20. When Rachves placed an order for the second phase of the Project Durabuilt demanded an increase in the deposit and more particularly stated in its deposit agreement as follows: Due to the good working relationship that Durabuilt has with Sima Barnet, Durabuilt has waived the engineering deposit for the Rachves Estates Phase #2. However, Durabuilt is asking that a production deposit of 30% of a full foundation be made. Durabuilt will consider this a rolling deposit that once it is made on the first foundation it will be applied to the following foundations till the last foundation is come off line. Then on the last foundation it will be applied to that invoice. However, all previous invoices will not have the deposit applied to it and will be required to be paid in full. The rolling invoice deposit structure has been a common agreement between Durabuilt and other Fallsburg developers."

21. In connection with the second phase of modular home ordered Durabuilt collected and retained the total rolling deposit in the amount of $66,024.68.

22. Rachves paid all invoices in full for all sixty-six (66) homes that were ordered and delivered to the Project site.

23. At all relevant times Durabuilt insisted on payment in full for each modular home before they were prepared for delivery and actually delivered for inspection at the Project site.

24. Durabuilt did not apply the rolling deposit to any invoices and continues to hold the total amount of $66,024.68.

25. Rachves did not place any further orders for modular homes and will not be placing any further orders for modular homes or any other products from Durabuilt.

26. Rachves has informed Durabuilt that it will not be placing further orders and has demanded the return of the rolling deposit in the amount of $66,024.68.

27. Durabuilt has ignored this demand and has failed to return to Rachves its funds in the amount of $66,024.68.

28. To date, Rachves has paid Durabuilt the total amount of $6,899,230.77 of which $66,024.68 being retained by Durabuilt represents a deposit that has not been applied to any invoices and has not been returned to Rachves.

29. Rachves has been billed and paid for all modular homes ordered and delivered from Durabuilt which equals the total sum of $6,833,206.09.

30. Rachves was presented with and paid in full invoices totaling the amount of $6,833,206.09 in each instance invoices paid in full before Durabuilt made delivery on each unit.

31. As units were delivered representatives of Rachves together with representatives of Durabuilt were taking note of items that were missing from various units that were required to be delivered to Rachves.

32. Initially, Durabuilt's representative, Eric Miller, developed a procedure whereby the open items of missing materials as well as service items due from Durabuilt were logged on a list created by him on google docs.

33. The earliest group of modular homes were delivered and all materials and service items were completed to Rachves' satisfaction.

34. Thereafter, a total of thirty eight (38) modular homes were delivered by Durabuilt in an incomplete, deficient, and non-conforming manner.

35. There came a time that Eric Miller was no longer employed by Durabuilt and a new representative was assigned by Durabuilt to act as the Durabuilt representative for Rachves' Project.

36. Durabuilt's new representative named Greg Buttorff and the Rachves site manager, Bucky Loucks, regularly walked through each modular home unit as they were delivered and noted all missing items and open service items.

37. Durabuilt's

38. Between June 2021 to the present date both the manager of Rachves as well as the representative of Durabuilt continuously updated the list of missing items and service Rachves and Durabuilt.

39. Between June 2021 to the present date Durabuilt failed and refused to provide all of the missing items and/or all of the service which Durabuilt was required to provide to Rachves.

40. Despite correspondence from Durabuilt promising to deliver the remaining materials and provide the promised service to date Durabuilt has failed to comply with its obligations.

41. As of March 22, 2022 Durabuilt was made aware of the remaining outstanding items and had received a detailed list of the remaining open items with regard to thirty eight (38) modular homes.

42. Durabuilt terminated the employment of their employee, Greg Buttorff, who was the single point of contact and the individual designated to complete service for the Rachves Project and have not assigned anyone else to provide this service.

43. Durabuilt also ceased sending missing materials and have ignored all requests from Rachves to comply fully with their obligations.

44. As such, Rachves is now forced to mitigate its damages and attempt to procure the missing construction items and perform the service itself at a significant additional cost over and above the payments made to Durabuilt.

45. Rachves paid Durabuilt in full which payment included the requirement to deliver the homes completed and provide service to make the homes turn key such as the installation of base molding and making the electrical and plumbing connections.

46. Because of Durabuilt's breach and failure to complete its work Rachves has spent and will continue to spend significant sums of money to complete the missing items on its own.

47. Rachves received an estimate from construction materials provider located in the area of the Project for the replacement of a portion of the missing items.

48. An example of the items that are missing includes but is not limited to the following categories of items: Base moldings, crown moldings, casing, screens, blinds, exterior siding, smoke detectors, faucets, toilet seats, lights, paint, lock sets, and closet and entry doors.

49. The cost to replace just a portion of the missing items that Durabuilt failed to provide is approximately $34,044.39.

50. Rachves is in the process of searching for additional replacement items and the cost of those items are expected to be no less than $20,000.00.

51. In addition to the missing items Rachves is also now forced to engage the services of professional carpenters, electricians, and plumbers to provide the completion of services to the modular home units that Durabuilt had promised to provide.

52. This work is ongoing and the costs of Rachves doing the work on its own instead of Durabuilt completing the services is ongoing but is believed to be no less than $38,000.00.

53. In addition to failing to complete the modular homes as promised it is evident that Durabuilt has repudiated its warranty obligations.

54. The continuing warranty and Rachves expectation that Durabuilt will honor the warranty and provide service once the homes are put into use can no longer be counted on.

55. As such, Rachves has not and will not receive the benefit of its bargain and the full value of its payments despite having paid to Durabuilt the sum of $6,833,206.09 for the homes and the rolling deposit which must still be returned.

56. Durabuilt must compensate Rachves for the lost value of the warranty in a sum to be more particularly calculated at the time of trial but is believed to be no less than $1,000,000.00.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

57. Plaintiff Rachves repeats and re-alleges the allegations set forth in paragraphs 1 through 56 as though fully set forth herein.

58. A sales contract for the sale and purchase of modular homes existed between Plaintiff and Defendant.

59. Pursuant to said contract, Plaintiff paid to Defendant and Defendant accepted the total sum of $6,899,230.77.
60. Pursuant to said contract, Plaintiff was billed and paid in full on all invoices the total amount of $6,833,206.09.
61. The difference between the total amount paid and the total amount billed represents a rolling deposit that Durabuilt required to be made at the beginning of the contract.
62. Pursuant to said contract, Plaintiff paid to Defendant and Defendant accepted and retained a production deposit in the amount of $66,024.68.
63. The payment by Plaintiff in the amount of $6,833,206.09 is payment in full for any and all homes that were ordered.
64. The production deposit was not applied to any invoice and as such is due and owing to Plaintiff Rachves.
65. Plaintiff Rachves is thereby damaged in the sum of $66,024.68.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

66. Plaintiff Rachves repeats and re-alleges the allegations set forth in paragraphs 1 through 65 as though fully set forth herein.
67. A sales contract for the purchase and sale of modular homes existed between Plaintiff and Defendant.
68. Plaintiff paid Defendant in full for all modular homes that were ordered in the amount of $6,833,206.09.

9

69. Defendant Durabuilt was required under the sales contract to deliver to Plaintiff sixty-six (66) completed homes including all details and materials that constitute a completed home which is ready for use by the end user.

70. Defendant Durabuilt delivered thirty eight (38) incomplete and non-conforming goods inasmuch as significant amount of materials and items of service were omitted and remain uncompleted.

71. Plaintiff gave Defendant prompt notice of the defective and non-conforming delivery including detailed lists of missing materials and items of service required.

72. As a result of Defendant delivering deficient and non-conforming goods Plaintiff has been injured in that Plaintiff is required to mitigate its damages and search for conforming materials to replace those that Durabuilt failed to supply.

73. Plaintiff has been further injured because Durabuilt's failure to provide the service required under the contract requires Plaintiff to expend additional sums of money to retain the services of professional carpenters, electricians, and plumbers to complete the items of service that Durabuilt was required to complete under the contract.

74. Plaintiff was thereby damaged in a sum to be more particularly calculated at trial but no less than ninety two thousand forty four dollars and thirty nine cents ($92,044.39).

### THIRD CLAIM FOR RELIEF
### (Breach of Warranty)

75. Plaintiff Rachves repeats and re-alleges the allegations set forth in paragraphs 1 through 74 as though fully set forth herein.

76. Plaintiff and Defendant entered into a sales contract for the manufacturing and delivery of sixty-six (66) modular home units to be delivered at the Project.

77. As part of the terms of the contract between Plaintiff and Defendant, Durabuilt promised to deliver completed homes that are of good quality, merchantable, and completed in accordance with the highest standards and specifications an in accordance with all requirements under the building codes in the State of New York.

78. Defendant Durabuilt did in fact deliver non-conforming homes that in some cases were missing significant items including but not limited to missing windows, siding, doors, molding, locks, and other items that are necessary to complete the homes.

79. As part of the contract with Plaintiff, the Defendant Durabuilt promised to the complete installation of all the missing items as well as providing service to each unit to ensure completion of the unit and fitness for its intended use a modular home.

80. As part of the contract with Plaintiff, the Defendant Durabuilt promised to provide a continuing warranty for the repair and service of the homes.

81. Due to the fact that many of the homes were delivered with significant missing items and to date have not completed some of the homes have experienced damage and deterioration prematurely that requires remediation.

82. Despite due and timely demand Durabuilt has failed and refused to provide service of items that were part of the contract and have failed and refused to provide service under its warranty obligations.

83. Moreover, due to Durabuilt delivering non-conforming and deficient homes the warranty period should not and cannot have been considered to commence since the homes are not yet completed.

84. Defendant Durabuilt has failed to provide the service required under the contract with Plaintiff and have in fact terminated the employment of the sole individual that was

designated previously by Defendant to provide service and warranty maintenance under the contract.

85. As a result of Durabuilt's actions it is apparent that they have repudiated the contract and refuse to abide by the warranty.

86. As such Plaintiff has been injured in a sum to be more particularly determined at the time of trial in an amount representing both the costs of Rachves performing all service and future warranty work as well as the diminution in value arising from Durabuilt's failure to comply with its warranty and service obligations in a sum of no less than $1,000,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A) A judgment on the First Claim for Relief in favor of Plaintiff Rachves Estates, LLC and against Defendant Durabuilt Homes, LLC in the amount of sixty-six thousand twenty-four dollars ($66,024.68) together with prejudgment interest and award of all costs and disbursements related to this action;

B) A judgment on the Second Claim for Relief in favor of Rachves Estates, LLC and against Defendant Durabuilt Homes, LLC in an amount to be more particularly demonstrated at the time of trial but not less than the amount of ninety two thousand forty four dollars and thirty nine cents ($92,044.39) together with prejudgment interest and award of all costs and disbursements related to this action;

C)     A judgment on the Third Claim for Relief in favor of Rachves Estates, LLC and against Defendant Durabuilt Homes, LLC in the amount to be more particularly demonstrated at the time of trial but not less than the amount of one million dollars ($1,000,000.) together with prejudgment interest and award of all costs and disbursements related to this action; and

D)     Such other and further relief as to this Court may deem necessary, just and proper.

Dated: May 9, 2022
        Brooklyn, New York

Respectfully submitted,
MALVINA LIN, P.C.

*Malvina Lin*

Malvina Lin, Esq. (ML5876)
1203 Avenue J, Suite 4B
Brooklyn, New York 11230
Tel: (718) 377-3500
Fax: (718) 377-4174
malvina@malvinalaw.com

*Attorneys for Plaintiff*
*Rachves Estates, LLC*